and Attorney General of Pennsylvania, number 17-3582. May it please the Court, my name is Jeremy Gutman and I represent Appellant Lane Hurley. With the Court's permission, I would like to reserve four minutes for rebuttal. That's fine. The issue presented by this case is what is the minimum amount of proof that the due process requires as a basis for a criminal conviction? Let me ask you a preliminary question that may or may not be of particular note. In its November 13, 2017 opinion, the District Court noted that Hurley is in the ninth year of his 10-year maximum sentence. Is he still in custody? And if so, then obviously we go on. But if he's not, what specifically is the relief that you seek? Obviously, there are cases which say you can go further. He is currently in custody. He's scheduled to be released in 2019. So the number was off, okay. Thank you. The standard from Jackson v. Virginia is very familiar. It's evidence must be sufficient. It's insufficient if no rational juror could find guilt beyond a reasonable doubt. And the cases, including Coleman v. Johnson, recognize the issue for a reviewing court is does the evidence fall below that threshold of rationality? Well, on direct review, you got a layer of VEDPA, which is going to make this a little bit higher of a hill for you to climb, right? Yes, it does. It does. And however, in this particular case, the standard in a habeas case is that the court's required, this court, a reviewing court is required to defer to the state court unless, and there are two exceptions, and the one that we rely on is that the findings of fact made by the state court, are unreasonable, based on an unreasonable reading of the record. So here's what I understand. Essentially, it sounds like you're arguing sufficiency. You have the testimony of Jessica, right? She says certain events happened, and obviously for some of them, only she and Hurley were present. But, you know, there's testimony from her family members. There's testimony from people at school. You know, much of this testimony, when looked at in its totality, would appear to corroborate her story. You know, Hurley coming in at night, being seen by, I believe it was the brother and the mother, you know, the whole locking of the door. So I'm not sure where the deficiency is. I mean, you know, as Judge Shigaris mentioned, it's a pretty high standard here. So what's the unreasonableness, specifically? Well, and I disagree with some of the assessment of the corroboration. But leaving that aside for the moment, what makes this case very different than the ordinary case that comes before the court for review is Jessica's testimony, unlike that of an ordinary witness in this typical case, is not that something happened to me, and I have a memory of it, which I have had continuously. Since the time it occurred. Her testimony is that for three and a half years, she had no memory of these events. Before a psychotic episode that took place in her junior high, when she was outside of her class, hallucinating, things... So the jury put forth the evidence, the jury heard about whatever the deficiencies were, and they made a determination. Your Honor, the state closes its eyes to the fact that this is a repressed memory case. What makes it a repressed memory case is the testimony of the witness whose evidence was the sole basis for this conviction. But I don't understand. You put on an expert, and you say, this is what it is, and here are the deficiencies, and this is why you shouldn't believe it, and the jury comes to a different determination. What on habeas review should we do? Your Honor, what we're urging the court to recognize about the testimony in this case is that by claiming that after years of having no memory, of claiming that the memory was something she had no conscious access to, suddenly, as she testified, it appeared to her as if a blanket were lifted or the clouds parted, and suddenly the memories were there. This is describing a phenomenon that science does not recognize. And there have been, as we talk about in our brief, dozens and dozens, hundreds, really, of studies, academic studies and clinical studies and papers in peer reviewed... But that would be... Wouldn't all that matter if the state had said, here's the reason that you should believe her. This is a repressed memory case, and let me tell you about the phenomenon. And here's an expert who will tell you that when someone presents repressed memories, there's a reason to believe it. Right? Now, that didn't happen. They put her on. She was subject to all the cross and the expert testimony. Help me. What the state did... Unreasonable. The state pretended that there... I'll amend my question to add that. I'm sorry, Your Honor. He said, how is it objectively unreasonable? It is unreasonable because in order to accept Jessica's testimony, one must accept a hypothesis which has never been proved and in fact is over decades of... The fact that she kept it, she intentionally suppressed it because she didn't want to hurt her family, her uncle, her brother, her uncle, her mom and dad, and eventually... And obviously she had a terrible leading disorder and then finally just couldn't take it anymore. Isn't that the evidence the government put out? No, Your Honor. Respectfully, that is a distortion of the evidence. Her testimony, and part of the problem in why the state court decision is an unreasonable application, unreasonable findings, they ignore her own testimony. Her testimony is not that I intentionally suppressed this. It is that just before her breakdown, she was having dreams in which someone was doing something to her, but she didn't know who it was. And suddenly in this moment when she's hallucinating and thinks she's being touched and talking in a little girl voice and she doesn't know where she is and who's talking to her, in that moment, the blanket is lifted. Again, this is her testimony. So the idea that she... The state, both the Commonwealth and the Superior Court, pointed to her testimony as being unreasonable. The testimony that I didn't want to hurt my mother, and that's why I didn't reveal this. The testimony where she said that, she was talking about why after this revelation, three and a half years after the event, that was when she spoke at that moment, when her mother came to get her at school, she didn't want to hurt her by telling her about it that day. It has nothing to do with three and a half years when by her own testimony, and the testimony that's really the core of the proof here, she's claiming the memory was not there until suddenly it was there. And for that to be true, one has to look at whether that is scientifically possible. I think it's a little different than a situation as follows. I am a victim of a crime. I don't report it for some period of time. I come forward with it. I recite a certain recitation of the event. As I'm reliving the event, because I'm being prepped by this overzealous prosecutor, I remember additional facts. And those are disclosed as remembering additional facts. And I go on the stand, and I'm crossed, and the cross-examiner says, you remembered this, and then all of a sudden you remembered a whole set of additional facts, all of which are inculpatory. And I say to my client, what's the difference between that situation in which credibility is judged, facts are presented, and in that case, you might have an expert say that, you know, this ladder inculpatory in my hypothetical is manufactured. What's the difference between those situations? And with that in mind, how is it objectively unreasonable so that we, on a habeas review, may give you the relief you seek? There's a critical difference. The scientists who examine memory say, and common sense tells you this too, a traumatic event is very memorable. Maybe not every detail, but the fact of it happening, if you know the party who is involved, the identity of the party, certain basics are very firmly remembered. And of course, under questioning, more details might appear. That is very different than what happened in this case. This case, the claim by the witness is there was no memory at all. She had been in a hospital, being treated by a team of doctors and psychologists, and repeatedly was asked about her sexual history, if she had any. She constantly, continuously, and consistently said, no, that never happened. And her testimony was in the weeks immediately before this breakdown, when she's dreaming about something, she couldn't really put it together. Then the cloud lifted, and it was there. It's not like a person who, for one reason or another, has chosen not to testify about something. And a fair reading of the record is that that's not what happened here. And the reason that it's unreasonable is that if the essence of the testimony requires accepting a phenomenon, if the witness said, I observed a crime taking place by looking through a wall, because I have x-ray vision, the burden I believe the court would hold is on the person. And if you had a conviction, because somebody said they had x-ray vision and they saw it all, that would be objectionably unreasonable, I think. But I don't understand why the two are equated. One seems, you know, obviously, phantasmagorical, or whatever the word is. But decades of scientific research have not shown a single documented case where there's an actual documented traumatic event, such as the ones described here, and a person can completely repress all conscious memory of it for a period of years and then retrieve that memory at some later date. And that has never, is no more proven in the world we live in than the x-ray vision. One is to conclude and to make new law that it is error to have a verdict stand under these circumstances. That's correct, Your Honor. And you had no prior precedent to rely on. Well, Your Honor, the law is not new. The law is that there's a threshold of rationality. What we're asking the court to say is to look at these facts where it's based on a phenomenon that has never been shown after decades of research to be possible, to happen with human beings. And on top of that, to have it in the context of this particular case where it emerges out of a hallucinatory experience. And in addition, just to go back to the issue of corroboration, the only, there was literally no corroboration that any crime ever took place, much less that it was committed by Mr. Hurley. Well, in these kind of sexual encounters, there rarely is. That's not news. That may be. And if it weren't for the other factors, certainly we wouldn't be making the same argument. But in this case, where the essence of the testimony is a memory was repressed for years, no conscious access to it, and then the witness gained access to that memory. In the way that was described here, that it is not rational and not reasonable to accept that in the absence of proof. And again, the prosecution did not offer any proof. I know my time is up and I've reserved. Yes, I was. Yes. I want to interrupt. Maybe just explain just in a little more detail what you're thinking about. What your theory is. I mean, is your theory that she just sort of Suis Ponte came up with it? Or is it that she talked to her psychiatrist, Dr. Lane Loney, and he somehow got it from her or somehow suggested it? Whatever. I'm just wondering what your theory is on that. The the well, what the evidence indicates is that the the she claimed that the memories of this happening came to her in the hallway of her school. And all of a sudden she remembered it all. Then immediately after that, she was taken to Dr. Lane Loney, who's a woman. And and rather than taking her to the emergency room and finding out that she had a memory loss, she was taken to the hospital. And so instead of finding out what caused this psychotic episode and if she's going through any medical or chemical issues that are causing these psychotic displays of hallucinating and disassociating, the therapist treated what she said in that state. And the state continued for a period of time. Her mother and others testified about continuing hallucinations, continuing talking in a little girl voice. And so during that period, the therapist reinforces her her beliefs or her these memories. And which which we concede she she clearly believes are true based on the way this this occurred. And the science indicates that people can do that. And I think that that had something to do with it, at least in I mean, and it's not the principal issue raised before this court, but it was raised in other context in this case. But there was there was a challenge to possible suggestion. But it's part of the overall picture of why this falls below a standard that can rationally support a conviction. But in the record, what you elicit from the doctor, I actually I don't remember who the questioner was, but certainly it's in the record. She specifically says that she did not use words to suggest she did not, you know, present questions in a leading fashion. She talked about her professionalism in this approach. So and I don't recall that being contradicted. So if that's the state of the record, then I don't understand your argument that the the therapist, in response to Judge Segarra's questions, that the therapist or psychiatrist was the source of of this testimony. Again, my position is not that the therapist was the source. The and the testimony you're talking about, there were actually two trials. And that was from a different trial. But because the therapist didn't testify at the trial that we're on appeal from at this point. But the our argument is not principally that the therapist was the source of the testimony. It's not principally about a suggestion being created and fabricated by the therapist and it being all about the therapist's suggestion. But the therapist's role basically helped solidify the memories that occurred, memories in quotation marks, that were revealed to Jessica during this trial. So it's, we're not asking this court to make a finding specifically that there was improper techniques that led to suggestion. But the entire situation, and again, I think it really raises a question, who bears the burden of proof when, as the Commonwealth says in their brief, they didn't, they didn't they basically say it's an open question how she was able to remember these things in the way she described. And the real issue for this court is, if it's an open question and there is no, there is generally no evidence that the phenomenon of repressing memories and then gaining access to them can occur as described, who bears the burden of showing scientifically that it could have happened the way the witness says it happened. Let me, let me give you a hypothetical. Same, same testimony, one fact changes. There's your client's DNA in Jessica's bed. Does that change anything? Well, yes, because our argument is where it is uncorroborated. And what we have here is the absence of evidence like that, even though you would have expected there to be physical evidence, you would have expected there to be some observation of this happening over several months with many people living in close quarters, with bedrooms in a shared hallway with creaky floors. So here there's, there is no, yes, yes, my position would be very different. I don't think I would be making this argument if there were some corroboration of that kind. The issue is you would not be making a repressed memory argument. That would undermine it. It would, it would certainly undermine it. There would be questions about, about the, well, I'm sorry, let me rethink the response to the hypothetical. It's all good. There would be enormous reasons for questioning this particular testimony. But I would not be making a repressed memory argument. I would not be making precisely the argument, and the issue that was certified for review by this court is a narrower question than that. It's where there is no corroboration. And you, so you view the mother testifying that she saw Hurley go into the daughter's, am I wrong about this? I have, let me see now. I have a brother as well. J.A. 130 says Hurley would go into Jessica's room, say goodnight to her, and she thinks she encouraged him to go. She said, quote, we always do nighttime prayers with the kids. So I'm sure I encouraged him to go in and have nighttime prayers, at least occasionally. Now, you know, you, you're right. There's not corroboration. I saw, you know, Jessica's room, and I'm sure I encouraged her to go in and have nighttime prayers. But, you know, having all of the family members say, yeah, I saw him, I saw him in the room, or I saw him go into the room, or whatever, that's corroboration. Because you want us, as I understand it, we're talking about the factual determinations, the error of the state courts, the factual determinations. So you want us to say that the factual determinations made by the court were objectively unreasonable. And when you say no corroboration, I mean, you know, any prosecutor would say, the more evidence I can put into the record that makes the witness's statement more likely than not is corroboration. I, I would disagree, Your Honor, because it does not corroborate the commission of a crime. There's no question he was in a hallway. And the fact that he, and she only spoke about it, the brother remembered one time that he was in a hallway, and there was no evidence that he was actually in a hallway. And there was no evidence at the time where he saw Hurley go into the room. And as, as you mentioned, the mother encouraged him to do that, to say prayers, to check on her at night. So that's like saying, you know, if someone claims a murder took place and it was next to a tree, and you showed that there was a tree, that doesn't corroborate that there was a murder. So, going, and again, on a single night, when allegedly, according to her testimony, this occurred 75 or more times, and... The mother didn't testify about a single night. I mean, she... I believe, I believe the mother didn't testify about ever seeing him go into the room. The brother testified about one time seeing him go into the room. But again, he slept across the hall. If that's true, that's not corroboration. If this was going on night after night, and other people went to that hallway to use the bathroom, no one ever saw him coming in or out furtively. I do take issue with the idea that an innocuous observation, or there was also a testimony about her locking her door, and again, there was no evidence that when her parents said, you shouldn't do that, because it's a fire hazard, that she protested or appealed. So, if you look at the evidence that's set, one would expect a much more substantial form of corroboration, if, in fact, the occurrences that she testified to did take place. That is just an additional layer of why this is irrational. But the fundamental irrationality is that we do not have genuine corroboration of a crime, and the only evidence is a witness claiming that there was a murder. And the only evidence is a witness claiming to have lost and repressed all memory of these events, and then had them come back, and there is no scientific evidence that that is any more possible than the X-ray vision. Thank you. Thank you. May it please the court opposing counsel, my name is Courtney Hare, and I'm here on behalf of the Cumberland County District. I'm sorry, I had a shell cyber. You're replacing her? I am. Okay, I'm sorry, we didn't know that. Courtney C-O-U-R-T-N-E-Y, and then Hare is H-A-I-R. H? H-A-I-R. Okay, thank you. And I am here on behalf of the Cumberland County District Attorney's Office, representing the appellees. Lane Hurley has twice been convicted of brutally, sexually abusing his then 10-year-old niece by two separate jury panels. This conviction has been upheld a multitude of times by half a dozen state courts, yet defendant continues to try to make this case into something it's simply not. There are three reasons this court should deny defendant's habeas petition. First, it is our belief that this appeal is improvidently granted, because it relies on a fact that is simply not of record. As your honors previously stated, they're assuming that this actually was a recovered, repressed memory, which is not true. It's not supported by the trial record. What makes this not a repressed memory case? Your honor, this is not a repressed memory case. When you look at the trial record, there was an in-depth, multi-day taint hearing conducted by Judge Oler prior to the trial. At that trial, multiple defense experts testified in this case. At that time, Judge Oler made a determination that the defense would be allowed to present evidence on repressed memory, and how repressed memory can be used as evidence. That repressed memory may be scientifically unreliable, but that the defense experts would not be allowed to comment on Jessica's credibility. At that time, the experts were provided some redacted medical records, and it has borne out that once the court has reviewed the unredacted medical records, that those records did not show any inappropriate therapy practices that sought to induce recovered or repressed memories. Which is something that each expert testified that they thought would be borne out by the records, and it just simply wasn't. Also, in this case, you had testimony from Jessica's treating psychologist, that she only asked open-ended questions, such as, what do you remember, or how does that make you feel? The attorney said that that was not in the trial that's now on appeal. Was that in the first trial? It was in the first trial, Your Honor. So does that mean that it should not be before us, or that it should not be part of our consideration? Because I presume, tell me if I'm wrong, that the error that he is seeking is error as to the factual determinations in the second trial. It would be, I believe, the error of the factual determinations by the jury in the second trial. Okay, and so that particular therapist didn't testify in the second trial. Was there any evidence presented with regard to Jessica's either meetings or sessions with that particular therapist? There was, to some extent, Your Honor. Jessica herself testified about her therapy sessions, and then there was testimony from the defense expert at that time about his testimony. And then there was testimony from his review of the therapy records. Also, there was testimony from Jessica, Trooper Kelly, her mom, and her dad, that no one coached Jessica on what to say, either to her therapist, to law enforcement, to the court, or anything like that. Could you tell me the, well, I don't expect you to recall the point in the transcript that I was reading from, but I did have a reference to the, the mother's testimony about Hurley coming into the room for, ostensibly for prayer to say goodnight or whatever. Correct. Was that presented in the second trial? It was, Your Honor. Okay, thanks. And was that undermined in any way by the defense? It was not. There was... Can you tell me the totality of that evidence? Sure. The totality of mom's testimony is mom testified that she would see the defendant go into Jessica's room at night, and that this was the kind of behavior that she actually encouraged. This was a very close-knit family. She wanted her children to have a good relationship with her brother, who, at the time, she was very close with, and was thinking that he was going in there for nighttime prayers. At that time, I believe on cross-examination, there were some questions asked to mom more about the setup of the house and whether anybody would have heard Hurley go into the victim's room late at night, but there was nothing contradicting him going in there for nighttime prayers with the kids, and I believe that this is something that Hurley may have even admitted to Trooper Kelly at the time during an interview. It looks like on cross-examination, the victim seemed to adopt the intention of going into the victim's room, and it was in the language of counsel that she had, quote, lost, close quote, her memories of the sexual molestation. That sounds like a repressed memory, right? Well, the way the victim actually phrases it is when he asks her if it's lost, she says that she wouldn't say that. That to her, she says, quote, it was like they were under a blanket and the blanket was lifted. So I guess if you want to call that lost, you could say lost. At that point, the defense attorney presses her on her memory between the time of the assault and when she had the disclosure at school and asked her about whether she had remembered it all in between that time frame, and at that point, she responds, how I kept them under a blanket, though, was I didn't eat. I would run and exercise, and it was how I kept them inside. So she specifically testifies to steps that she was taking to not deal with this trauma that had happened with her. And as evidenced by the record, although the eating disorder didn't get to the point where it required inpatient treatment until almost she was in eighth grade, the issues with her having the eating disorder and starting to exercise and control her eating happened almost immediately after the defendant moved out of the home. So this was a problem that started to develop immediately after the abuse, and it just didn't come to a head until several years later. There was also corroborating evidence in the trial testimony from other witnesses besides just mom. Both mom and dad testified that Jessica had very strange behavior that summer. They both testified that Jessica started locking her doors, which they had told her not to do because it's a fire hazard, and they also both testified that Jessica, on at least one occasion, if not more, had actually kicked out the screen of her bedroom window and exited her bedroom and went out into the yard in the middle of the night. This behavior stopped immediately after the defendant moved out. There is absolutely no indication that Jessica kept doing this once the defendant and the threat to her was removed from this home. And as Your Honor mentioned, there was also testimony from her brother, who I believe was seven or eight years old at the time, that he would see the defendant go into the victim's room late at night. Now, as a seven-year-old, he didn't think anything of it, but after his sister made this disclosure, he told police. Let me ask you this question. If I understand your adversary's argument, this is only a question of the factual determinations that the court came to, because we're applying the facts to the facts. This is an objectively unreasonable standard, is that right? Correct, Your Honor. Because there's no legal error, it's factual error. Correct. So that would mean that this is really a question of, was it objectively unreasonable to admit this evidence into... I'm sorry, right. Was it objectively unreasonable to admit this evidence altogether, right? Correct. Which would mean that the trial court would have made an error considering allowing Jessica's testimony in, given what the experts had said. But that error seems to be a legal error, so I'm a little confused. I'll get him on rebuttal, but I want to know what your understanding of the argument is, because if the question is, given what the expert testimony was, it's error to have allowed Jessica's testimony in, that seems to be a legal question and not a factual one. Correct, Your Honor. And it's my understanding that the defense originally raised both of these issues and then expressly abandoned the issue of the admissibility of Jessica's testimony when he initially filed his habeas brief with the district court. Okay, thank you. I have no further questions. Do you have anything else you want to sum up? Your Honor, just in conclusion, there's a highly differential standard under Jackson to view the evidence in light most favorable to the prosecution, who was the verdict winner below. There's no doubt about that. And this is a jury trial, and a jury sat there and heard this testimony and heard this victim testify, and they also heard testimony from various defense witnesses and an expert talking about whether her testimony was credible or not. This jury believed her, and I do not believe that we should upend that jury verdict here today. I'm going to ask that you deny Defendant Habeas Ruby. Thank you very much. Thank you. If I could respond to Judge Greenaway. Oh, I was hoping that you would. The issue, there was a motion, a pretrial motion to exclude the testimony, which is a separate issue, and we did not press that on the habeas mostly because of habeas jurisprudence that doesn't lend itself to that being reviewed by a federal court. A correct ruling on that would have obviated the issue that we're here on. However, the fact that there was an opportunity for the trial court to exclude the evidence doesn't change the need and the duty of a federal reviewing court to consider the sufficiency issue. Is my analysis off? I mean, this seems to be a legal question, and the legal question is, given the expert testimony on one side and the lack of expert testimony on the other, the court should have precluded her testimony because it's hallucinatory, right? That seems to be a legal question, which your adversary has said, and the papers would seem to support, is not why we're here. And if the reason that we're here is the factual determination, I'm trying to figure out, is the factual determination letting it in? That's not a factual determination. The issue we're here presenting is factual sufficiency, does it meet the standard of Jackson v. Virginia? The fact that there was a related issue that could have, we think, if properly ruled on, excluded Jessica's testimony altogether is a different question. It's not either or. But as I'm thinking about this question, the sufficiency argument is just, look at what's before the jury and what the jury determined, and obviously the court, after the jury determination, did not sustain your objection, is objectively unreasonable. I get it. Well, the position that we're advocating and we urge the court to adopt is that where the testimony that the prosecution chooses to rely on as the sole basis for conviction involves a memory process and a description of a memory process for which there is no scientific support, that there is no, that does not, according to scientists, has never been empirically established and many scientists are highly skeptical and debunk the theory that that's possible. I don't get that. If that's your argument, that's a legal question. I don't get that. You're not making a legal argument. No, because it's a question in this context about who bears the burden of proof. And we heard from the Commonwealth's attorney a theory that the eating disorder was a means of repressing the memory. That's another unusual phenomenon. If that's their position, if that's what they want a jury to base its conclusion about, why this is testimony you can rely on as proof beyond a reasonable doubt, the burden of showing that there is a scientific, that there's some kind of scientific support for a theory that someone can willfully repress memories by developing an eating disorder. And the only evidence on that subject was Jessica's own and whatever else she was, she was not an expert on the processes of memory. The issue is when the prosecution relies on evidence that involves unusual, unproven theories. And the fact that they didn't articulate the theory doesn't mean that they didn't rely on the theory. Because you can't accept this proof unless you accept the idea that it could have happened the way Jessica said it did. If it's not... But didn't you have a... The trial judge held a separate hearing outside the hearing of the jury, right? To test the evidence and decided it was acceptable and not otherwise objectionable, I guess, right? And if it weren't for the jurisprudence that makes that not a viable issue on a habeas petition, we would be here arguing that. But the fact that we can't argue that doesn't take away from the validity of saying there's still a burden of proof and when the proof requires accepting a phenomenon of human memory that is not only unproven but very strongly disputed, the burden of showing that this could have happened the way the witness testified it happened, that the memory could have come to her that way, that's a burden that reasonably should fall upon the prosecutor. And in the absence of evidence that can show that there's science that would make the processes testified to something that's consistent with human experience that has to be proven. One word, Dalbert. I'm sorry, you're on? I said one word, Dalbert. Thank you, Your Honor. Thank you very much. Thank you to both counsel for very well presented arguments and we'll take the matter under advisement.